Pages 1 - 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   VS.                         )   NO. CR 21-00121-JD
                               )
JESSIE ALEXANDER RUSH, SIMON   )
SAGE YBARRA, KENNY MATTHEW     )
MIKSCH,                        )
                               )
            Defendants.        )
_____)

                         San Francisco, California
                         Tuesday, February 22, 2022

                  TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:
                         STEPHANIE M. HINDS
                         Acting United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California 94102
                   BY:   ERIC CHENG
                         FRANK J. RIEBLI
                         ASSISTANT UNITED STATES ATTORNEY

For Defendant Rush:
                         LAW OFFICE OF ADAM PENNELLA
                         717 Washington Street - Second Floor
                         Oakland, California 94607
                   BY:   ADAM PENNELLA,ATTORNEY AT LAW

           (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant Ybarra:

3                              LAW OFFICES OF MARTIN A. SABELLI
                              740 Noe Street
                              San Francisco, California 94114
4                        BY:  **MARTIN A. SABELLI, ATTORNEY AT LAW**

5    For Defendant Miksch:

6                              BAY AREA CRIMINAL LAWYERS, PC
                              300 Montgomery Street, Suite 660
                              San Francisco, California 94104
7                        BY:  **DAVID J. COHEN, ATTORNEY AT LAW**
                              **ALEXANDER GUILMARTIN, ATTORNEY AT LAW**
8
     Also Present:  Jessica Goldsberry, U.S. Probation
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

| | |
|---|---|
| 1 | **Tuesday - February 22, 2022**                              **10:35 a.m.** |

2                    P R O C E E D I N G S

3                        ---oOo---

4        **THE COURT:**  Good morning.

5        **THE CLERK:**  Calling Criminal 21-121, United

6   States of America versus Jessie Alexander Rush, Simon Sage

7   Ybarra, and Kenny Matthew Miksch.

8     Okay.  Counsel?

9        **MR. CHENG:**  Good morning, Your Honor.  Eric Cheng and

10  Frank Riebli on behalf of the United States.

11       **THE CLERK:**  Use the microphones.  You can take that

12  one down and put it on the table, if you're going to sit.

13       **MR. COHEN:**  Okay.  Good morning, Your Honor.  It's

14  David Cohen and Alex Guilmartin on behalf of Mr. Miksch.

15       **MR. SABELLI:**  Good morning, Your Honor.  Martin

16  Sabelli for Simon Sage Ybarra, who is present with his family.

17       **MR. PENNELLA:**  Good morning, Your Honor.  Adam

18  Pennella on behalf of Jeremy Rush, who is present in court.

19       **OFFICER GOLDSBERRY:**  Good morning, Your Honor.

20  Jessica Goldsberry for the probation office.

21       **THE COURT:**  Where are the defendants?

22       **THE CLERK:**  The defendants need to stand.

23       **THE COURT:**  And they should be up here.  They should

24  be in the well.  Why are they in the audience?

25       **MR. COHEN:**  Your Honor, Mr. Miksch has now walked

1    forward and is present.

2         THE COURT:   Okay.  All right.  You all can sit down.

3    There's some extra chairs on the side if you need them.

4         Now, we're all fully vaccinated.  If you are fully

5    vaccinated, if and only if, and you prefer to take your mask

6    off while you're speaking, that's perfectly fine with me.  It's

7    up to you.  I will take mine off.  If you choose not to, that's

8    perfectly fine.  Either way, make sure you're close to the

9    microphone so I can hear what you're saying.

10        Let me just start by sharing what my initial thoughts are.

11        I have spent a considerable amount of time and reflection

12   on an individual basis for all three of the defendants before

13   me, each of them individually, on the record that I have,

14   that's been made known to me; on the presentence reports for

15   each of the defendants; and the Government's sentencing

16   materials and the defendants' sentencing materials; and all the

17   letters that I've received in connection with them.  And I know

18   there was also one psychological report as well.

19        I have also taken into close consideration the sentencing

20   options that are available to me under the United States Code,

21   which permits a sentence for up to 20 years in custody for each

22   of the defendants, and under the advisory guidelines, which has

23   a much more curtailed sentencing range, but is only advisory

24   and is only a guideline.

25        I've also taken into account the recommendations from the

**PROCEEDINGS**

1   parties, both the Government for certain terms of custody, and

2   from the defendants and probation.

3       My sense, as I start us off here today, is I am inclined

4   to reject the C pleas.  I do not think that the proposed

5   sentences, the constraints on my sentencing authority are

6   consistent with the interests of justice or the goals of

7   sentencing as Congress has mandated them in 18 United States

8   Code Section 3553(a).

9       And before we go any farther, I want to hear from

10  everybody about why I should or should not turn down the

11  C pleas.  So let me start with the Government first.  And you

12  can do it on a macro basis, on an individual basis, however

13  you'd like to proceed.

14       **MR. CHENG:**  Your Honor, thank you.  Thank you for

15  sharing your initial thoughts on the parties' proposed

16  agreement.

17       We set forth this range because we thought it was

18  reasonable given the calculation set forth in the plea

19  agreements under the guidelines, and it also afforded an amount

20  of discretion for Your Honor, between 6 to 12 months.  And we

21  set forth, thinking that given our assessment of each of these

22  individuals alone and collectively and this group, that this

23  would be a reasonable and appropriate range for sentencing.

24  And that's why we've proposed these C agreements.

25       I can allow the defendants to each explain their positions

**PROCEEDINGS**

1    as well.

2          **THE COURT:**  Well, I guess my question for the

3    Government is:  You know, you proposed periods of custody that

4    are within the advisory guidelines range; but the advisory

5    guidelines range and the statutory range are apples and

6    oranges.  I think the advisory guidelines range maxes out at

7    something like 14 months; is that right?

8          **MR. CHENG:**  That's correct, 8 to 14 months,

9    Your Honor.

10          **THE COURT:**  Okay.  And then the statute goes up to

11    20 years.

12       So I think this is a situation where the guidelines do not

13    adequately address the seriousness of the charge and I think

14    the statute does a much better job of that.  So I know you

15    elected to work within the guidelines framework, but you had a

16    lot of room to run under the statute.  So, you know, I'm not --

17    I'm not feeling bound by the guidelines.

18       But why -- just looking at the facts in this case, why do

19    these 10-month and 12-month custody sentences that you've

20    proposed make sense?

21          **MR. CHENG:**  Your Honor, those are the ones we proposed

22    for the reasons we set forth in our sentencing memoranda.  And

23    if Your Honor does not feel that those would be adequate in

24    this case, the Government is also prepared to go to trial as

25    well.

1        **THE COURT:**  Okay.  All right.  Let me just hear from

2   the defendants.  Who would like to start?

3        **MR. COHEN:**  Good morning, Your Honor.  It's David

4   Cohen on behalf of Mr. Miksch, and thank you for Your Honor's

5   comments.

6        I guess, part of what I don't know in terms of

7   Your Honor's reasoning is whether Your Honor's view is that --

8   that this is a -- Your Honor's inclination to reject the C

9   agreement is something that applies across the board as to all

10  three defendants, or whether there is room in Your Honor's

11  thinking to address --

12       **THE COURT:**  Well, I'm glad you asked that.  This came

13  up at the last -- the conference we had.

14       I'm considering each defendant individually; however, I

15  have been advised that you all, meaning you defendants and

16  the Government, independent of me, have some kind of a package

17  deal; is that right?  So if any one of the defendants -- if I

18  turn down any one of the defendants' C pleas, every other

19  C plea goes up in smoke; isn't that right?

20       **MR. COHEN:**  Oh, I'm not sure that that's correct,

21  Your Honor.  And, I mean, I was not here at the last calling of

22  the case.  I'm not sure if that's correct under the agreement;

23  but perhaps the Government can speak to that because I'm not

24  sure that that was our overall agreement.

25       **THE COURT:**  That's an important -- let me just pause

**PROCEEDINGS**

 1   there.

 2       Isn't that right, Mr. Cheng?

 3       **MR. CHENG:**  That's correct, Your Honor.  Our

 4   participation in any of these C pleas is contingent on the

 5   C pleas being -- each of them being accepted by Your Honor and

 6   each defendant following through as well.

 7       **THE COURT:**  So --

 8       **MR. COHEN:**  Okay.  Well, that's the answer to that.

 9       If that's the case, Your Honor, perhaps -- and I don't

10   know whether this is would be fruitful, but perhaps it might be

11   worthwhile to trail the matter just for -- briefly so each

12   party could address the Government and see if we can come to

13   Your Honor with three individual ones, because that might at

14   least move some part of the case forward.

15       **THE COURT:**  Okay.  So you -- in other words, maybe

16   decouple; is that what you're saying?

17       **MR. COHEN:**  If the Government would be open to it.

18   And I haven't had really a chance to talk about that with them

19   because I didn't know that Your Honor would necessarily reject

20   all three -- you know, reject the agreements or be

21   contemplating rejecting them, like Your Honor has said.

22       **THE COURT:**  What do you think about that, Mr. Cheng?

23       **MR. CHENG:**  Your Honor, the Government is not

24   considering that at this point.  Part of the adjustment in

25   these guideline calculations in these plea agreements is

**PROCEEDINGS**

1  accounting for the fact that all three men would plead guilty

2  and be sentenced together.

3         **THE COURT:**  Right.  I think what your colleague is

4  proposing is what, maybe a two- or three-week period just to

5  talk about it?  I'm not going to put anybody on the spot right

6  now but -- and you may have your position in mind; but I'm

7  happy to do that if people would like to do that.

8      I welcome -- I'm happy and welcome any pitches you want to

9  make about why these pleas make sense.  They don't to me.

10        **MR. COHEN:**  Right.

11        **THE COURT:**  If you have comments about that I'd be

12 happy to hear it; otherwise, I'm going to set a trial date.

13        **MR. COHEN:**  That's why I'm saying, Your Honor -- I

14 appreciate that.  The two- to three-week period I think could

15 be helpful to the parties.

16     As an initial point, I think that that's something we

17 should consider.  So we can maybe come back to the Court --

18 because the Court has spent all this time reviewing the matter,

19 and has it all in mind, has the probation reports -- we might

20 be able to come back to the Court individually, or at least

21 with some type of modification.

22        **THE COURT:**  I think we can achieve both goals.  I'll

23 set a trial date.  The first Monday in June.

24     What date is that, Ms. Clark?

25        **THE CLERK:**  That would be June 6th.

**PROCEEDINGS**

1      **THE COURT:**  Okay.  June 6th, 9:00 a.m., jury trial.

2      **MR. COHEN:**  That --

3      **THE COURT:**  But, that still gives you plenty of time

4      to have any discussions you'd like.  Your hands would not be

5      tied in any way.  Whatever agreements you and the Government

6      wish to talk about, you'll have more than three months to get

7      that done.

8      **MR. COHEN:**  Sure.  I happen to know that that's a date

9      I'm already in a trial.  I'm wondering if, perhaps, Your Honor

10     might consider giving us a couple of weeks to talk, and then we

11     come in and we propose a trial date, not way out into the

12     future, but a trial date that we all can meet, so that way we

13     don't end up setting a date that isn't necessarily available.

14     But I'm also happy to talk about why I think these agreements

15     make sense.

16     **THE COURT:**  All right.  Well, I'm going to keep that

17     trial date.  And I understand, you know, things change, so if

18     we need to move it, we'll think about that; but I'm going to

19     set trial for all three matters on June 6th at 9:00 a.m.

20     What would you like to say about sort of the merits of the

21     C plea?

22     **MR. COHEN:**  Sure.  So, again, because -- I don't know

23     that the very fact that the statutory maximum is higher than

24     the guidelines is necessarily something that -- that should

25     cause the Court to reject the plea.

**PROCEEDINGS**

1          The reason I say that, Your Honor, is because there are,

2     as Your Honor knows, innumerable examples where the statutory

3     maximum is very much higher than the advisory guidelines.  And

4     I'm not sure that the disparity between the statutory maximum

5     and the advisory guidelines is an actual basis recognized under

6     3553(a) for a variance upward.

7          I do think that if the Court considers individually each

8     defendant and has appropriate reasons or a basis for a variance

9     upward, that could be appropriate; but the mere disparity

10    between the statutory maximum, I don't know that that itself

11    is -- is a reason Your Honor should reject the agreements.

12          **THE COURT:**  I agree with that.  And that's not at all

13    the basis for my decision to decline the C pleas.

14          You're absolutely right, there are other situations.  Not

15    that many in my experience, but there are the situations where

16    the guidelines provide a recommended sentencing range that's a

17    fraction of the statute.  That, in and of itself, plays no role

18    in my decision.  I'm looking only at the facts of this case.

19          **MR. COHEN:**  Sure.  So just so that I can be clear

20    about my comments, I don't know that the very -- the offense

21    itself is such that it's out of step with the guidelines.

22          Now, if Your Honor is talking about the facts of this case

23    and the alleged destruction -- or the admitted destruction, as

24    part of this plea agreement, of the evidence, I think that

25    the Government was correct in considering this particular deal

1    or making this recommendation.

2         These are three individuals who are not particularly

3    sophisticated -- I think in my client's case, the least

4    sophisticated.  And they did not actually participate in any

5    particular violent crime.  They said some stupid things and as

6    a result of what they did, they did delete certain materials.

7    These are not materials that actually were kept from the

8    Government.  The Government had them anyway -- would have had

9    them anyway.  And there wasn't any actual effect on any

10   prosecution, nor was there likely to be such an effect.

11        So it was bad conduct.  And I'm saying this for the

12   purposes of the sentencing and the plea as we contemplated it.

13   I mean, obviously, if we go to trial then these comments are

14   not --

15             THE COURT:  Of course.

16             MR. COHEN:  Are not part of that.  And I'm not,

17   you know, I'm kind of caught between -- nobody here at this

18   table, this defense table, believes that this conduct is -- is

19   in any way anything other than reprehensible.

20        We said -- he doesn't make any apologies.  I state that in

21   our conclusion.  It's not that he doesn't apologize for his

22   conduct.  He's not trying to justify.  That's what we meant by

23   that phrase.  He's not trying to justify what he did.  But it

24   was somebody who's young.  He's grown tremendously in the last

25   couple of years.

**PROCEEDINGS**

1        And I think that, you know, the Government took the facts

2   here, which were highly difficult facts, highly inflammatory

3   facts, and they made the determination that:  Look, this is

4   conduct that should be prosecuted.  This is conduct that would

5   be felonious conduct.  There should be some type of jail

6   sentences appended to it, but given who the individuals are and

7   actually what happened, is not conduct that should go above the

8   range that we talked about.

9        And the range which talked about is fairly consistent with

10  the guidelines.

11       So I don't think that this is a case -- and I think

12  probation agreed with it as well -- that is outside of the

13  heartland, as the Sentencing Commission talks about.

14       I don't even know if there is anyone on the Sentencing

15  Commission today.  There might be one person on the Sentencing

16  Commission --

17          **THE COURT:**  There is one judge, and he is on the

18  17th floor.

19          **MR. COHEN:**  -- from this court.

20          **THE COURT:**  There is, literally, one judge.

21          **MR. COHEN:**  And he is trying to get some more people.

22  So I don't know, when I say "commission" --

23          **THE COURT:**  He's two floors below you.

24          **MR. COHEN:**  Right.  So I am not sure, when I say

25  "commission," it sounds like a lot of people.

**PROCEEDINGS**

1    But there was a time when there were multiple people on

2   the Commission.  And there is a phrase that has been used and

3   it's -- the question is:  Are we outside the heartland?

4    And, frankly, we don't think -- the parties don't think

5   that this sentence is outside the heartland or the -- in this

6   particular case, nor does probation.

7    So I'd ask the Court to please consider -- because

8   Your Honor said we -- you know, Your Honor went through this

9   carefully.  And the parties went through it carefully.  I mean,

10  we had extensive negotiations.  We talked about this

11  extensively.  We were very careful in putting together these

12  agreements.  I would ask the Court to consider all of those

13  points, and allow, maybe, my colleagues to address the Court.

14           **THE COURT:**  Okay.  Thank you.

15           **MR. SABELLI:**  Good morning, Your Honor.  Martin

16  Sabelli.  I represent, Mr. Ybarra, who is seated to my right.

17    Good morning, Your Honor.  Thank you for the opportunity

18  to address the Court's question.

19    I want to make three points.  First point is that I agree

20  with Mr. Cohen and with the Court, that the circumstances that

21  the Court drew to our attention, the gap between the guideline

22  range and the statutory maximum is, as both Mr. Cohen and

23  the Court said, not an uncommon occurrence; and, in fact, it is

24  built into the guidelines that there be the possibility of a

25  sentence that is much lower than the statutory maximum.

1          In cases in which there are multiple charges, for example,

2     multiple statutory maximums which could be stacked, it's very,

3     very common to have a huge disparity between the guidelines and

4     the statutory maximum.  So I think that's something to be

5     expected.  And that brings me to my second point, which is that

6     what we have here is essentially a conspiracy, and every

7     conspiracy has an enormous range of potential levels of

8     participation.

9          So you could have a conspiracy in which somebody is

10     guilty -- and quite often I'm called upon to do this in the

11     gang RICO cases, represent somebody who has actually pulled the

12     trigger or been the shot-caller on a heavy series of murders in

13     a gang RICO context.  And in the same conspiracy, you might

14     have somebody, a young man, who participated in one or two

15     robberies or one or two street fights.

16          And although it's the same conspiracy and umbrella -- and

17     by the way, this concept of conspiracy is something that is --

18     perhaps, I'm going to use this word -- perhaps it's a little

19     too strong, but it's pretty close -- it's pretty unique to the

20     United States.  In other parts of the world, there is a sense

21     of:  Wait.  What are you talking about?  How can you put all

22     these people under the same umbrella?

23          And I certainly feel that quite often when I see

24     conspiracies.  As I said before, I'm quite -- my clients are

25     often at the top end of the conspiracy.

**PROCEEDINGS**

1          In this case, we have a conspiracy which could be framed

2    in many, many different ways.  And my client is somebody who --

3    and I think that's -- it would be fair to say with respect to

4    the other clients in this room -- is somebody who is involved

5    at the low end, in a tangential way.  And that is exactly what

6    the guidelines contemplate and permit.  And so the notion, yes,

7    there is a conspiracy and that conspiracy should have a 20-year

8    max so that the Court can exercise its discretion.

9          But in a case like this, where the conspiracy is so broad

10   and it could be argued or framed in so many different ways,

11   with gentlemen who were involved in a minimal, limited way,

12   with the caveats that Mr. Cohen indicated, including their age,

13   the fact that the information is basically available to the

14   Government anyway, didn't really impede the conversation.

15         In the case of my client, he was open and spoke to the FBI

16   immediately.  When he was detained, he immediately let the FBI

17   or let the Government know, through me, that he had purchased a

18   gun and it was sitting in Sacramento.

19         This -- in that context, the conspiracy law is -- although

20   it's something I'm not very happy about generally, as a

21   criminal legal reform matter, it certainly gives the Court the

22   right kind of discretion to decide where Mr. Ybarra, or any of

23   the other clients, fit in this what you could describe as a

24   ladder of culpability.

25         And these three gentlemen are the bottom rungs of the

1  ladder and that's exactly -- of culpability in this conspiracy,

2  which is exactly why the Government landed there; exactly why

3  they've been out of custody; exactly why they have had no

4  problem out of custody.

5      And it's reflected in the tremendous advancement -- I'll

6  speak for my client, I'll let the other counsel speak for their

7  clients -- the tremendous work that my client has done and been

8  able to do once his focus was taken away from the conspiracy.

9      And by the way, that's something I see with all of my gang

10 clients.  And I consider the Grizzly Scouts a kind of a gang

11 here that filled a void in my client's life, and perhaps the

12 lives of others.  And so what I have seen is that once their

13 focus is taken away, once their family structure is bolstered,

14 once they get clear-eyed, they don't make that mistake.  And

15 that's exactly what's happened with Mr. Ybarra.

16     And that brings me to my last point which is:  If we don't

17 have this kind of nuance and rationality in the application of

18 statutory maximums, we end up with a criminal legal system

19 that's overloaded with people in prisons in the carceral system

20 who not only don't need to be there, but who are actually being

21 hurt, and communities that are being hurt by them being put

22 there.  That quite often is framed or placed in the frame of

23 mass incarceration of people of color which is, no question,

24 one of the darkest stains on the United States and modern

25 America, all the folks we have, poor people, and people of

 1  color, disproportionately in prison.  This is the case where

 2  the clients are not people of color, but they have succumbed to

 3  conditions and voids in their life in a moment of crisis in the

 4  country where people are panicked, where everybody has sort of

 5  lost their compass in some way.

 6      And I think it's for that reason, and particularly the

 7  reactions of some of the clients once confronted and their

 8  behavior on pretrial release, all of that underscores the

 9  rationality of a sentence that is consistent with the

10  guidelines and, in fact -- you know -- and I'm going to say it,

11  but I'm sensing Court isn't going in my direction here, but my

12  client not being sentenced to custody time.

13      But I think the bottom line, in my opinion, Your Honor, is

14  that this is exactly the kind of situation in which the

15  appearance of conspiracy creates a kind of anchoring effect

16  that is counterproductive to the policies of a rational

17  criminal legal system.

18      So I would urge the Court to take another look, and look

19  at what these folks have done on release; look at how -- their

20  relative age; the trauma they have all suffered in their

21  different ways, and to accept the plea agreements so we can

22  move forward, they can move forward and we don't end up

23  burdening a prison system with folks who are just not going --

24  they are not going to benefit, their communities are not going

25  to benefit and our communities in terms of public safety are

**PROCEEDINGS**

1    not going to benefit by locking these people up.

2        **THE COURT:**  Okay.  Thank you.

3        Any other defendants' counsel?

4        **MR. SABELLI:**  Yes, Your Honor.  Thank you, Your Honor.

5        **MR. PENNELLA:**  Good morning, Your Honor.  Adam

6    Pennella on behalf of Jessie Rush.

7        **THE COURT:**  Get closer to the mic.  You can pull it

8    towards you.

9        **MR. PENNELLA:**  I would largely echo the comments of my

10   colleagues, and for all of the reasons that we specified in

11   Mr. Rush's sentencing memo, his history of service to people

12   around him; putting himself in harm's way; the effect of that

13   throughout his life, show -- as well as his performance on

14   pretrial supervision show that the need for him to be in

15   custody for any purpose other than just pure punishment is not

16   necessarily served by going outside of the guidelines.

17       I think it's clearly aberrational conduct when looking out

18   at the scope of his life and what he has done, and what he has

19   suffered as a result.  And so I would echo my colleagues'

20   comments and request that the Court perhaps take a second look

21   and reconsider the terms of the agreement that the parties

22   worked hard on getting to you.

23       **THE COURT:**  Okay.  Any closing remarks, Mr. Cheng?

24       **MR. CHENG:**  Your Honor, the Government would just want

25   to remark with respect to defense counsels' comment on

**PROCEEDINGS**

1  culpability.  Just to be clear, we settled here because that is

2  what we could prove beyond a reasonable doubt at this juncture,

3  not because of what we believe to be the limit of their moral

4  culpability.  And we'll just leave it at that.

5       **THE COURT:**  Thank you.  I appreciate that.

6       Let me just tell you what the foundational legal

7  principles are and I'll tell you how we're going to end for

8  today.

9       There is no absolute right on the part of any defendant to

10  have a guilty plea accepted.  The decision to accept or reject

11  a guilty plea is entrusted to the Court's sound discretion.

12  That's *Santobello v. New York*, 404 United States Reports 257,

13  1971, at page 262.

14       To be sure, Rule 11(c)(1)(c) allows the defendant and the

15  prosecutor to agree to recommend a specific sentence; but that

16  agreement does not discharge my independent obligation to

17  exercise my discretion.  That's from *Freeman versus United*

18  *States*, 564 U.S. 522, at page 529.

19       In exercising that discretion, I am guided by two bright

20  shining lights: the public interest and what best serves the

21  interest of justice.

22       I can accept a (c)(1)(c) plea only if I am satisfied that

23  the sentence is an appropriate sentence or that there is some

24  justifiable reason for accepting sentence as proposed.

25       Now, I am not in any way, shape, or form involved in this

**PROCEEDINGS**

1  or a participant in any of the plea discussions that the

2  Government and the defendants have.  I'm not suggesting any

3  type of sentence.  I'm not giving any kind of an implicit

4  indication of the sentence.  I'm out of that picture

5  whatsoever.  But I'm going to decline the C pleas because they

6  are manifestly, in my discretion, not in the interest of the

7  public or in the interest of justice.

8       This was a group founded by Defendant Rush, participated

9  in by Defendant Ybarra and Defendant Miksch, that also included

10 the shooter, Defendant Carrillo, who is in another case in

11 front of another judge.

12      This was a group that existed for one purpose, and the

13 record is crystal clear on this.  They were dedicated,

14 consciously and deliberately, to a scheme to target and kill

15 innocent law enforcement officers.  To that end, three

16 defendants here actively engaged in planning, in training, and

17 in arming themselves in preparation for the execution-style

18 murders of law enforcement personnel.

19      One of their associates, Carrillo, took the step of acting

20 on that.  He ended up killing a court security officer in

21 Oakland, seriously injuring another one, and then killed a

22 Santa Cruz Sheriff's deputy, and seriously injured another

23 deputy.

24      Make no mistake, I understand the three defendants in

25 front of me did not pull the trigger.  I'm not holding those

1   murders or those grievous serious injuries to those victims

2   against them.  They did actively participate in discussing it,

3   in fomenting it, and in setting the stage for these types of

4   horrible, heinous, shocking acts to happen.

5        There are two families, two families who will never see

6   again the two men, the two officers who were killed as a result

7   of Mr. Carillo's behavior.  And these defendants were part and

8   parcel of working with them, communicating with him,

9   training -- one of them, I believe Mr. Ybarra, even assembled

10   an auto -- an assault weapon in the van for Mr. Carillo.

11        Isn't that right, Mr. Cheng?

12         **MR. CHENG:**  That's correct, Your Honor.

13         **THE COURT:**  The idea -- as one of defendants said in

14   the memorandums that I got -- that this was a paintball club or

15   a libertarian discussion group is so far off the mark with the

16   facts before me that I just -- I can't even see how it's

17   possible for someone to have said that with a straight face.

18        It's not a paintball club.  This was a group of people

19   dedicated to killing innocent law enforcement officers.  One of

20   the defendants used his government military training in the

21   service of that heinous end.

22        I understand that -- and Mr. Rush I'm talking about.  I

23   understand that he made some significant sacrifices to our

24   country overseas, and I respect that; but he betrayed those

25   principles to no end when he teamed up with three other -- two

1  other defendants to create a group that had one purpose and one

2  purpose alone, planning the execution of law enforcement

3  officers.

4      That's why I'm not accepting the C pleas.  And I'm looking

5  forward to having this trial and we'll see what a jury has to

6  say, and we'll see what happens after that; but if you want to

7  work out something in between, I'm happy to consider it.

8      A couple of other comments, just along the way, in the

9  statements, I just want to be clear for the record, the

10  difference in the sentencing range under the statute, I think

11  it's Section 1512(k);is that right?  Okay, 18 United States

12  Code Section 1512(k), 20 years and the guideline provision up

13  to 14 months, that's not a motivating factor.  There are gaps

14  in the world of all types.  That has nothing to do with my

15  decision here today.  This is because these individuals are a

16  manifest threat to public safety, safety of law enforcement

17  officers, and safety of the people around them.

18      I haven't had a case where I have seen more of a public

19  threat than these people, because this group had one principle

20  in mind: killing innocent law enforcement people.  I cannot

21  emphasize that enough.  That is, by definition, the most

22  extreme threat you can have to public safety.

23      So is there a punishment component?  Of course.  But is

24  there a protection to the public?  Absolutely.

25      The second point is, of course people are differently

1  situated in conspiracies.  We all know that.  We deal with this

2  every day.  And people's role will be weighted given their

3  level of participation.  It's not a one-price-for-all.  Don't

4  be under the impression that just because you're part of a

5  conspiracy, everyone moves in lockstep; there are hubs; there

6  are spokes; there are captains; there are corporals.  That will

7  all come out when the appropriate time comes for sentencing.

8  It will be each individual's culpability that I will sentence

9  when that day comes.  It is not going to be a wholesale group

10  sentence just because they are all part of a conspiracy.

11       Another point was made that:  Oh, they were so great.  The

12  defendants were so great after they got arrested.  They told

13  the FBI everything.

14       Okay.  Well, what did they do to stop these murders before

15  they happened, when they knew that this was a likely outcome of

16  their acts?

17       The record says that on May 29th -- wasn't that the day of

18  the shooting in Oakland, Mr. Cheng?

19            **MR. CHENG:**  Yes, Your Honor.

20            **THE COURT:**  Within one hour of the shooting in Oakland

21  on May 29th, I think it was Defendant Miksch -- and I'm saying

22  their name right, I hope -- sent a Tweet or a message out to

23  the whole group saying there has just been a -- something to

24  the effect of, "So it begins."

25       One hour after that Oakland shooting on May 29th, did any

**PROCEEDINGS**

1   one of these defendants say anything at that point to law

2   enforcement?  Did any one of them have the decency to step up

3   and say, "This got out of hand.  I didn't mean this.  I didn't

4   want to be involved in this"?  Not one.

5        A week later, Santa Cruz Sheriff's deputy is dead, another

6   one seriously wounded.  Did any one of those defendants step up

7   after that and say, "Now I can't go any farther"?  Not one.

8   Only after they got arrested did they start to talk.  So I

9   don't give them any points for that.

10        In fact, I think it reflects some of the cravenness of

11   their behavior.  Because after both of those events,

12   May 29th and June 6th, what's the one thing they did do?

13        Didn't go to the police; we know that.  Didn't lift a

14   finger to help the victims; we know that.  The one thing they

15   did was cover their tracks.  Delete, delete, delete.  Hide.

16   Run away.

17        That's where I'm coming from.  Justice is not served by

18   the recommendations for -- I think one of the defendants said,

19   "Just send me home.  I shouldn't be in prison at all.  Send me

20   home with 200 hours of community service."

21        That does not even remotely serve the interest of our

22   republic, fairness to our citizens, or the goals and purposes

23   of sentencing and justice.

24        So that's why I'm rejecting these sentences.  Trial is set

25   for June 1st.  I'm happy to consider any revised plea

1  agreements if you want me to do that.  If there is some motion

2  to continue the trial date, I want a detailed explanation of

3  what the circumstances are that would require the trial to be

4  pushed out.

5        Anything else for today, Mr. Cheng?

6        **MR. CHENG:**  Given the June 6th trial date --

7        **THE COURT:**  Did I say June 6th?  Yes.  June 6th.

8     Okay.  Go ahead.

9        **MR. CHENG:**  We should also set a pretrial conference

10 date.  Under your civil standing order, I know it's about

11 19 days before the trial date.

12        **THE COURT:**  Oh, yes.

13        **MR. CHENG:**  In this case, for a criminal case, given

14 that 19 days, that's about May 18th; but perhaps we could set a

15 date a little bit earlier than that.

16        **THE COURT:**  That's a -- is that a --

17        **THE CLERK:**  That's a Wednesday.  So it would be

18 May 16th.

19        **THE COURT:**  How about May 16th?  Oh, wait.  Actually,

20 let's -- let's do it on Thursday.  Is that the 17th?

21        **THE CLERK:**  May 19th.

22        **THE COURT:**  May 19th at 1:30 p.m.

23        **MR. COHEN:**  Your Honor, it's David Cohen on behalf of

24 Mr. Miksch.

25     Is it possible that we could set a date, a status date of

**PROCEEDINGS**

1    some kind in two or three weeks to try to address some of these

2    concerns with the Government and a potential plea offer?

3              **THE COURT:**  To come back here?

4         **MR. COHEN:**  Yes.  And also to address the trial date,

5    only because I know now that it's going to be very difficult

6    for me to make that date.

7         I have conflicting schedules.  And we also -- in looking

8    at this case and preparing for trial, need to consider all the

9    pieces to it as well.

10        So perhaps we can file something in writing in detail

11   prior to that date addressing the trial date and potentially

12   addressing plea agreements that Your Honor might accept.

13             **THE COURT:**  We'll keep the trial date on.

14        But do you want to come back in a couple of weeks,

15   Mr. Cheng?

16             **MR. CHENG:**  That's fine, Your Honor.

17             **THE COURT:**  Do you want three weeks?

18             **MR. COHEN:**  Three weeks would be -- would be

19   excellent.

20             **THE COURT:**  Okay.  What would that be, Ms. Clark?

21             **THE CLERK:**  That would be March 21st.

22             **THE COURT:**  Am I here that date?

23             **MR. COHEN:**  Your Honor, may I ask for the 24th because

24   Mr. Guilmartin and I --

25             **THE COURT:**  I can't do the 21st anyway.  Which date

**PROCEEDINGS**

1    did you want to do?

2            MR. COHEN:  The 24th, just because we're going to be

3    in trial that week, Mr. Guilmartin and I.  We're dark on

4    Thursday --

5            THE COURT:  I can do the 28th.  I do Mondays.

6            THE CLERK:  The 14th or the 7th of May.

7            THE COURT:  No, the 21st -- so the 28th.

8            THE CLERK:  The 28th.

9            THE COURT:  I can do March 14th or March 28th.

10           MR. COHEN:  The problem is we're just in this ongoing

11   trial and we're dark on the Thursdays each one of those weeks.

12   That's why I'm wondering if Your Honor might consider specially

13   setting it on that --

14           THE COURT:  Oh, you're dark on Thursdays.

15           MR. COHEN:  Yes, we're dark.  It's a weird day, but

16   Judge Kramer is dark on Thursday.

17           THE CLERK:  Let's do the -- oh, you're not going to be

18   here.

19           THE COURT:  Well, okay.  Let's do March 24th.  Is that

20   the Thursday?

21           THE CLERK:  Yes.

22           THE COURT:  The 24th.

23           THE CLERK:  You already have a 1:30 matter.

24           MR. SABELLI:  Your Honor, this is Martin Sabelli for

25   Mr. Ybarra.

1     I will not be here starting March 21st for a few weeks, so

2  either I can have one of my colleagues stand in or we can do it

3  the week before.

4        **THE COURT:**  Okay.  I'll tell you what, if you want to

5  come back, you all pick a date; otherwise, see you on May

6  whatever that was.

7        **MR. CHENG:**  May 19th.

8        **THE COURT:**  Yeah.  May 19th.  Okay.  I tried.  I

9  can't -- I had too many people and schedules.  So I'll see you

10  on May 19th.

11     If you want to work out something beforehand, just let me

12  know.  Please check my calendar.  I am super, super booked,

13  like all of us are, but I'll fit you in if I can.  If you want

14  to do a Thursday or something, that's fine, but just pick --

15  look at my calendar.  Okay?

16        **MR. COHEN:**  Thank you, Your Honor.

17        **MR. CHENG:**  And, Your Honor, given that we've set a

18  trial date, we think it would be appropriate to exclude time

19  between today and June 6th.

20        **THE COURT:**  I'm sorry.  So having declined the

21  C pleas, all of the guilty pleas are deemed withdrawn, so we're

22  set for trial.

23     And, now, you want to exclude you exclude time?

24        **MR. CHENG:**  Yes, Your Honor.

25        **THE COURT:**  Okay.

**PROCEEDINGS**

1          **MR. CHENG:**  We think an exclusion of time would be

2    appropriate, for effective preparation of counsel.

3          **THE COURT:**  Okay.  Any objection by the defendants?

4          **MR. COHEN:**  No, Your Honor.

5      Are the plea agreements also withdrawn?

6          **THE COURT:**  What did you all decide on that?

7          **MR. CHENG:**  As we understand it, the plea agreements

8    have been rejected by the Court.

9          **THE COURT:**  Well, I've rejected them, but I thought

10   there were some provisions -- I don't know.

11         **MR. CHENG:**  Yes, there are provisions --

12         **THE COURT:**  I leave it up to you.  They're your

13   agreements.  You look at them and tell me what you think.  And

14   if I have to make a call on something, I will be happy to do

15   that; but the guilty pleas themselves are deemed withdrawn,

16   whatever the contents.

17      It's the Government move to exclude time.  Any opposition

18   by any defendant?

19         **MR. COHEN:**  Not on behalf of Mr. Miksch.

20         **MR. PENNELLA:**  Not on behalf of Mr. Rush.

21         **MR. SABELLI:**  No, Your Honor.

22         **THE COURT:**  Time is excluded through June 6, 2022.

23   Okay?  Okay.

24      Thanks very much.

25         **MR. COHEN:**  Thank you, Your Honor.

PROCEEDINGS

1          MR. CHENG:  Thank you, Your Honor.

2          THE CLERK:  All rise court is in recess.

3              (Proceedings adjourned at 11:16 a.m.)

4                      ---o0o---

5

6              **CERTIFICATE OF REPORTER**

7          I certify that the foregoing is a correct transcript

8     from the record of proceedings in the above-entitled matter.

9

10    DATE:   Sunday, February 27, 2022

11

12

13

14    _____

15        Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
             Official Reporter, U.S. District Court

16

17

18

19

20

21

22

23

24

25