MARTIN ANTONIO SABELLI
(SBN CA 164772)
Law Offices of MARTIN SABELLI
740 Noe Street
San Francisco, CA 94114-2923
(415) 298-8435
msabelli@sabellilaw.com

Attorneys for SAGE YBARRA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 21–121- JD |
| Plaintiff, | **JOINT SUPPLEMENTAL SENTENCING MEMORANDUM** |
| v. | |
| SAGE YBARRA, | |
| Defendants. | |

Defendants Jessie Rush, Simon Ybarra, and Kenny Miksch hereby supplement the arguments and information from their previously filed individual sentencing memoranda.

**INTRODUCTION**

I. <u>The Court Should Not Impose Punishment for Constitutionally Protected Thought.</u>

This Court cannot, consistent with the Constitution, punish the defendants for their political thought no matter how abhorrent this thought might be to the Court.

Equally as important, this Court cannot transform the charges in this case from those sought by the Government – Conspiracy to Destroy Records – into a much more serious charge – Conspiracy to Murder Federal Officers – which has not been charged, discovered, investigated, or proved.

Moreover, this Court should not assume – and lacks an evidentiary basis to conclude – that the defendants in this case participated in, approved of, or were otherwise legally complicit in any violent acts committed by others. Rather, the evidence shows that they *discussed* law enforcement and governmental overreach and expressed opinions that violence may be necessary in response.

Further, this Court cannot infer that all members of a particular group had the intention to commit murder because one member of the group committed murder.[1] Belonging to a particular group – like the Grizzly Scouts – does not establish an intention to commit the most atrocious acts committed or advocated by other members. As discussed below, this principle is often applied in the context of "gangs" which is an apt characterization for the Grizzly Scouts – a substitute family for young men lost and confused for personal reasons (family issues), national issues (the confusion of the pandemic), and neurological and mental health related issues (including the well-documented delays in frontal lobe development for young men and altering of neural development due to

---

[1] Nor can one be punished for conspiracy to commit murder without proof of actual intent to do so.

childhood trauma). The individual bases for these issues were set forth in the individual sentencing.

Finally, the need to allege and prove violent intention – absent here – is a particularly critical part of the analysis when, as here, there is **nothing** in the past of the defendants suggests a willingness to commit violence. And, in fact, each of the young men standing before the Court has consistently demonstrated respect for the Court, the Government, and the process.[2]

II. <u>The Court Has Signalled an Intention to Impose a Sentence Based, in Part, on the Thoughts Expressed by the Defendants.</u>

Based on previous comments, the Court appears to be poised to cross each of the lines outlined above. The Court appears to harbor an intention to punish these young men because they belonged to a group that discussed using violence though none of them participated in violence, though the Government did not charge them with violence, and though the most that can be said of *what they actually did* was to destroy evidence of past crimes (for which they will be punished).[3]

Undersigned counsel respectfully submit that this Court cannot take the reigns from the Government and effectively decide that these young men should have been charged with a conspiracy to murder and, in turn, sentence them consistent with the phantom charge that the Court would have preferred. This Court should consider, given the feelings it has repeatedly expressed regarding the thoughts expressed by the Grizzly Scouts, that young men – especially very young men – often lose their way badly and say *and do* things which are not necessarily consistent with their true nature and

---

[2] After his arrest, Mr. Ybarra, for example, cooperated fully with law enforcement and voluntarily advised the Government of the fact that he had purchased, but never taken possession of, two firearms. This unusual admission could have been incriminating but Mr. Ybarra made it because, once he was cut off from the Grizzly Scouts, his value system kicked back in *as is common for young men who are recruited into gangs and have the good fortune of being separated from the gang by some circumstance.* Mr. Rush similarly communicated with the government and informed agents of information they might find helpful that he learned from his work in private security. And even before his arrest, Mr. Miksch left the Grizzly Scouts soon after learning of Mr. Carrillo's crimes, and then engaged in a lengthy interview with law enforcement when first contacted.

[3] With respect to the expression of hateful thought, though numerous other individuals participated in the expression of hateful thought in the same WhatsApp test string at issue here, these others were not charged in this case, presumably because they did not destroy evidence.

which they later regret deeply.

### III. The Conduct and Speech at Issue Occurred During the Most Confusing Period in this Nation's History and Reflects, in Part, the Youth of Each of the Defendants.

The defendants in this case were extremely young they were recruited to, and joined, the Grizzly Scouts; Mr. Ybarra was 21-22 years old, Mr. Miksch 21 was years old, and Mr. Rush was 29 years old. Given their youth, they were ill-equipped emotionally and neurologically to understand fully the import of their words given the lack of frontal lobe development before age 28, especially for males. Each of them also suffered substantial trauma and individual mental health issues discussed more fully in the previously filed individual sentencing memoranda and Pre-Sentence Reports.

The choices these young men made also occurred during the pandemic – a period during which they felt lost, afraid, and confused, as many did. These feelings of confusion and fear were triggered, to a great extent, by the inflammatory speech and conduct of some of our nation's ***elected*** "leaders" many of whom remain in office. It is worthy of emphasis that these elected leaders, none of whom have been charged, made highly inflammatory comments endorsing narratives not unlike those embraced by the Grizzly Scouts.

Moreover, these young men, like many young men who are lost, joined the Grizzly Scouts for a sense of belonging. In this respect, this type of confusion is not atypical for young men who lack structure in their lives. Even a superficial familiarity with the extensive literature on participation in gangs demonstrates that the primary motivation for participation in a gang is a ***sense of belonging***. Belonging, of course, often manifests in statements totally divorced from actions and reality. On the street, this is known as "puffing" which reflects a desire to belong and fit in rather than an intention, even a willingness, to act.

In this respect, Section 3553 instructs this Court to consider the history and characteristics of the human beings before it and, in that frame, it is apparent that the thought and words expressed by

these young men should be considered in the context of the pandemic, of the national divisions exposed and inflamed during the pandemic, and of their age and difficult lives. Their confusion is even more understandable in the context of a global pandemic which upended the world causing communal and personal fear on every level – personal, political, economic, cultural. Further the pandemic isolated people, bombarded minds with misinformation intended to provoke, and aggravated social and cultural divisions. That is the context in which these young men *explored and expressed this thought*.

It is also worthy of emphasis that, during this same period of time, *through present*, numerous elected representatives said *and did* things which resulted in physical violence, which threatened the lives of others including the Vice President and members of Congress, and which have not been charged. It is in this context that these young men lost their way, and ignoring that context not only lacks compassion but also ignores the effect on mental health and mature decision making that this upheaval caused. It misreads what was going on the heads of so many young people protesting, often violently, on all sides of most protests across the country, many of whom were met by police conduct that ranged from unprepared to violent and thuggish.[4] The context in any case is important; but in this case, with these defendants who have never engaged in any similar or otherwise criminal conduct,

---

[4] Left-wing and right-wing protestors often engaged in acts of violence against property and sometimes against other human beings. Government actors also lost their way. In fact, reporting indicates gang-like conduct by federal officers in numerous contexts including the clearing of protestors from Lafayette Square to abductions of protestors in Portland. See *In City After City, Police Mishandled Black Lives Matter Protests*, NY Times, March 30, 2021, available here: https://www.nytimes.com/2021/03/20/us/protests-policing-george-floyd.html; Federal Officers Use Unmarked Vehicles To Grab People In Portland, DHS Confirms, NPR, July 17, 2020, available here: https://www.npr.org/2020/07/17/892277592/federal-officers-use-unmarked-vehicles-to-grab-protesters-in-portland; U.S. settles with Black Lives Matter protesters violently cleared from White House park, Reuters, April 12, 2022, available here: https://www.reuters.com/world/us/us-justice-dept-settles-cases-related-police-response-dc-anti-racism-protests-2022-04-13/; Trump again stokes racial divides, a reality at odds with his efforts to court black voters, ABC News, May 30, 2020, available here: https://abcnews.go.com/Politics/trump-stokes-racial-divides-reality-odds-efforts-court/story?id=70957826; George Floyd: Timeline of black deaths and protests, BBC News, April 22, 2021, available here: https://www.bbc.com/news/world-us-canada-52905408

context is that much more critical and, of course, central to this Court's duty under Section 3553.

IV. The Defendants Conspired and Attempted to Destroy Evidence Which Cannot Be Legally equated with Forming an Intent to Harm Anyone.

The statements of the defendants and approximately fifteen others on the Grizzly Scouts WhapsApp text string may be offensive, abhorrent, and concerning speech – especially to those who have devoted their lives to the rule of law such as officers, members of the bar, and judges. There is, however, a difference of Constitutional dimension between what someone says and what someone does. Steven Carrillo demonstrated an intention and willingness to act on his statements about harming law enforcement. He did not seek to employ these defendants (or others in the Grizzly Scouts) to commit these acts with him.

Their offense of conviction, and the only crime with which these defendants were charged, does not involve acts of violence. *See also* ECF docket 11, denying stay of release order of defendant Ybarra: "Ybarra is not accused of committing violence against others". It involves obstruction of justice: attempting – unsuccessfully – to destroy evidence showing defendants' (and others') connection to, and discussions with, Steven Carrillo, someone they knew through participation in the Grizzly Scouts group. This is the conduct for which this Court should punish them; not for the abhorrent nature of these communications but for the crime that they committed.

V. Remand at Sentencing Would Be Unnecessary, Inconsistent with the Standards and Practice, and Unduly Punitive.

Unprompted by the Government, and despite exemplary conduct by the defendants during release, this Court indicated after change of plea, *sua sponte*, that the defendants should be prepared for remand at sentencing. This warning by the Court appears to reflect the Court's intense disapproval for the hateful thought expressed by the defendants during the time they belonged to the Grizzly Scouts, and intention to dole out additional punishment for that speech.

Remand at sentencing is unwarranted, not only because it is not called for by statute or requested by Probation or the Government, but because these defendants' conduct over the past two

years does not justify it. They have demonstrated a respect for this Court, the Government, their counsel, and the process since the FBI executed search warrants at their residences nearly two years ago, on August 6, 2020. Nor was there any problematic conduct between then and their initial appearances in this case eight months later, in April, 2021.[5] Despite the government's arguing for detention at that time, different magistrates (in different districts) found insufficient evidence of danger or flight based on the government's arguments then (which is the same evidence being utilized in the arguments at sentencing): the participation in the Grizzly Scouts, the connection with Carrillo, and their statements expressed on the WhatsApp text string. Indeed, this very Court, in denying the government's motion to stay the release of defendant Ybarra, stated the obvious: "Ybarra is not accused of committing violence against others."

Moreover, since release, these defendants have been fully compliant with all conditions of release: they have been gainfully employed, participated in mental health and substance abuse counseling and testing, reported to Pretrial, abided by curfews, and made all court appearances. There is no evidence of flight risk or danger to justify remand. Nor does remanding these defendants at sentencing serve a rehabilitative purpose: they would simply sit in Santa Rita Jail for months waiting for designation.

Indicating, as this Court did, that the defendants are a "manifest threat to public safety" ignores the Court's own facts and findings. Remand at sentencing would be nothing more than punishment for the thoughts expressed by the defendants before arrest.

VI. The Court Should Sentence these Defendants Consistent with the Terms of the Previously Rejected 11(c)(1)(C) Plea Agreements to Avoid Potential Error

On April 26, 2022, the day after two of the defendants entered their second guilty pleas, the

---

[5] Indeed, Mr. Rush responded to a call from the FBI to ask him additional questions at a local police station. Despite being on his way to work, Mr. Rush turned around to voluntarily meet with law enforcement, at which time he was arrested.

6th Circuit limited the ability of district courts to accept or reject plea agreements. In Re United States v. Sutton, No. 21-1318 (6th Cir. 2022).[6] In *Sutton*, the parties agreed upon terms of a plea agreement that included terms of which the court disapproved (waivers of appeal). The court rejected the plea agreement and set the matter for trial. The government filed a petition for a writ of mandamus, which "poses questions about a district court's authority to comment on pending plea-bargain agreements and to reject an agreement once it is finalized." In determining whether to issue that writ, the Court had to determine whether the district court "participated in the parties' plea negotiations and whether it improperly rejected the resulting plea agreement."

The Court explained mandamus is the proper, and only, remedy "where there is a clear abuse of discretion or a judicial usurpation of power." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004). The Court found that the district court violated Rule 11's prohibition on judicial involvement in plea negotiations and abused its discretion by not offering case-specific reasons for rejecting the plea agreement. It found mandamus appropriate because the district court overstepped its authority.

While in *Sutton*, the government was the movant (joined by the defendant), the 9th Circuit has similarly found the relief appropriate relief for a defendant to request. *In re Benvin*, 791 F.3d 1096, 1103-4 (9th Cir. 2015) (granting defendant's mandamus petition and finding his choice between trial and a less-favorable plea agreement did "not provide her adequate relief and [could] cause prejudice not correctable on appeal" and that "reassignment to a different judge" best served the interest of justice given views expressed by the current district court judge).

The Courts of Appeals in *Sutton* and *Benvin* each discuss different ways in which a district court can inappropriately involve itself in, and have an effect on, negotiations of a plea agreement. These include expressing blanket non-case-specific views (as in *Sutton*), as well as opinions about the particular case (as in *Benvin*). Taken together, these cases show that a district court must be

---

[6] *Sutton* is available here: https://www.opn.ca6.uscourts.gov/opinions.pdf/22a0086p-06.pdf

JOINT SUPPLEMENTAL SENTENCING MEMO
SAGE YBARRA 21 CR 121-JD

particularly mindful of how the court's comments can affect plea negotiations and therefore run afoul of Rule 11's long standing and "stringently interpreted" prohibition on participating in plea discussions.

In *Sutton*, the issue was rejection of the plea agreement because of a government policy that included waiver of appeal. In *Benvin*, the issue was the plea agreement's being conditioned on the government dismissing numerous counts and seeking consent to do so from the alleged victims. In both cases, the appellate courts found that the court had erred by inserting itself into the plea discussions. The *Benvin* court went further and found that reassignment to a different district judge was appropriate to maintain the appearance of justice: "The current district judge has already expressed explicit views on the appropriate terms of the parties' plea agreement, suggested the terms he would and would not accept…In such a situation, '[w]hether or not [the district judge] would reasonably be expected to put out of his mind the…conclusions previously drawn…to preserve the appearance of justice…we conclude reassignment is appropriate. *Benvin* at 1104 (internal citations omitted).

Here, as discussed above, the Court expressed that the defendants are guilty of a charge that has not been alleged, discovered, admitted, or proved. It has expressed that the Guidelines in this matter – upon which the prior C plea sentences were predicated – do not adequately address the seriousness of the charge. The Court injected its views on the defendants, that they are culpable for a scheme to "consciously and deliberately…target and kill law enforcement officers" when the indictment charged, and the defendants pleaded guilty to, destruction of evidence. It proclaimed that these defendants are more of a manifest threat to the public than this Court has ever seen despite the fact that none of them have committed acts of violence, or any crimes, in the past. Coupled with the Court's more recent statements that the defendants should be prepared for remand at sentencing, these comments demonstrate that this Court has expressed particularly strong views both of the

defendants' culpability and of the terms of sentence that would or would not be acceptable while sending the parties back to prepare for trial or negotiate a plea (as is the case with 98.3 percent of federal criminal cases).

To put it another way, the Court has improperly inserted itself into plea negotiations by conveying a view that these men are guilty of a much heavier crime and, therefore, of the need for a greater punishment which the Court would require. Taken together, the Court's comments improperly infringe on the free and voluntary resolution process. The defendants are in a bind similar to that of the defendant in *Benvin*: accept more serious consequences now or go to trial knowing that the Court views them as guilty of an uncharged and very serious conspiracy.

## **CONCLUSION**

For the foregoing reasons, the most appropriate remedy, consistent with Rule 11 and Separation of Powers, is for the Court to accept the terms of a sentence outlined in the original (C) plea agreements. These agreements were made freely and voluntarily between the parties based on the actual crime committed without this Court injecting its views of uncharged crimes into the process.

DATED:  May 3, 2022                    Respectfully submitted,

                                        _____/s/_____
                                        MARTIN A. SABELLI
                                        Counsel for SAGE YBARRA


                                        _____/s/_____
                                        ADAM PENNELLA
                                        Counsel for JESSIE RUSH


                                        _____/s/_____
                                        DAVID COHEN & ALEX GUILMARTIN
                                        Counsel for KENNY MIKSCH